THE MAYOR AND ALDERMEN OF JERSEY CITY, appellants,

*v.*

JERSEY CITY WATER SUPPLY COMPANY, respondent.

[Argued March 22d, 1911. Decided July 11th, 1911.]

On appeal of the mayor and aldermen of Jersey City from a decree confirming a master's report advised by Vice-Chancellor Stevens, who delivered the following opinion:

I do not think that the decree as it stands should be so modified as to direct the payment of the $500,000 reserved. After giving the contract of July 8th, 1901, considerable study, I am not able to come to the conclusion that the release of May 12th, 1909, is a sufficient compliance with its terms to entitle the water company to the immediate payment of the money. To so hold would be to nullify the general intent of the parties as expressed in the instrument itself. But I do not think the question should be finally passed upon at this time. If the contention of the water supply company be correct, it would seem that the liability of the Fidelity and Deposit Company, the surety, would or might be considerably increased. If so, the company is interested in the question and should be heard. I cannot find among the papers any copy of the condition of its bond, but it would seem from the terms of the contract of July 8th, 1901, that it is under some liability for the flow of the Rockaway up to the limit of seventy million gal-

lons per diem. The question has been informally presented, and without any issue framed. In a question of such importance, the proper course would appear to be to present the matter by bill and leave to file it should be reserved.

As to the Boonton drain, it appears from the master's report that there was put in evidence before him a contract dated October 14th, 1909, between the Morris Canal and Banking Company, and its lessee, the Lehigh Valley Railroad Company, of the one part, and the Jersey City Water Supply Company of the other. The master says that notwithstanding the license thereto given to conduct and maintain the drain and pipes, he is constrained to report the cost of intercepting sewers for Boonton, because the contract, by its provisions, will cease to be binding in case navigation shall be abandoned, either from legislative action or from any other cause. It is a matter of common knowledge that such abandonment has been seriously considered for years past. The evidence in this cause shows it to have been. By the charter of the company, the state has the right to take the canal at its fair value in 1924, and if not taken then, it and its appurtenances will vest in the state in 1974. Boonton is largely built on a steep hillside which sinks abruptly into the Rockaway river. It is so near the reservoir that, from the outset, it has been conceded on all sides that a drain is necessary. The intercepting drain above referred to is designed to catch any polluting matter that would otherwise find its way into the stream.

As under its contract the water supply company is bound to give a good title to its plant, of which this drain is an important part, it would seem clear that it does not fulfill its obligation when it gives a drain subject to alteration at the pleasure of the canal company, the title to which, as above stated, may expire at any time. On the other hand, it would seem unjust to withhold from the water company indefinitely, the cost of the intercepting sewers that may never have to be substituted. This cost the master has reported to be $58,300. I think that if the water company will give bond with sufficient surety to reimburse the city, up to this amount, for what it may be obliged to expend, when the drain shall cease, for any lawful reason, to be as efficient as it now is, the city will be adequately protected.

214    COURT OF ERRORS AND APPEALS.

Aldermen of Jersey City v. Jersey City Water Supply Co.    79 Eq.

The master reports that the device for removing dangerous germs now in operation is effective and capable of rendering the water delivered to Jersey City pure and wholesome for the purposes for which it was intended. I see no reason to dissent from his view.

The city contends that the annual cost of operating and maintaining this device should be capitalized and the capitalized sum deducted from the contract price. The contention rests upon the eighth section of the original contract, which provides that the operation of sewers and sewage disposal works constructed or arranged for by the contractor shall not be a charge upon or expense to Jersey City. It is conceded that the device in question is not referred to in this or any other section of the contract, but it is argued that as the company is relieved from building, maintaining and operating sewers and disposal works, it should be subjected to the cost, not only of installing the device, which it has done, but of maintaining and operating it. The first section of the contract provides that "if such works and supply are purchased by Jersey City they shall be delivered to Jersey City, *as a completed operating plant free from pollution as aforesaid.*" The general obligation is to furnish a plant; not the money wherewith to operate it. I think that if the cost of operating it or of keeping the water pure is to be borne, in any measure, by the water company, it must be because of some express provision in the contract to that effect. If the company provides a plant capable, if properly operated, of furnishing pure and wholesome water, it fulfills its contractual obligation. If the city would compel it to do more, it must show that it has, in its contract, agreed to do the very thing demanded. The plant will not deliver pure and wholesome water automatically. Chemists, bacteriologists and inspectors will have to be constantly employed; the banks of the river will have to be policed; land along the sources of the stream will have to be acquired; floods and droughts will have to be guarded against; repairs will have to be made and a steady flow of the water constantly maintained—all at the expense of the city. The cost of operating the device in question falls into the same category.

I thought that a fence around the reservoir was, because of its

location, a proper part of a completed plant, but the court of errors and appeals, because it was not expressly required by the terms of the contract, held otherwise. Here the court is asked to go farther. It is sought to compel the company to furnish, not what might be thought to be a proper part of a completed plant, but a sum of money to defray the costs of a part of its operation, in the absence of any contract on its part to pay such costs.

*Mr. James J. Murphy* and *Mr. James B. Vredenburgh,* for the appellant.

*Messrs. Collins & Corbin,* for the respondent.

PER CURIAM. ·

That portion of the decree which is involved in the present appeal will be affirmed for the reasons stated in the memorandum opinion delivered by the vice-chancellor in the court below.

*For affirmance*—THE CHIEF-JUSTICE, GARRISON, SWAYZE, TRENCHARD, PARKER, BERGEN, MINTURN, BOGERT, VREDENBURGH, CONGDON—10.

*For reversal*—None.